**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) Plaintiff, ) | 2:12-cr-00279-GMN-GWF |
| ) vs. ) | **FINDINGS &** |
| ) | **RECOMMENDATIONS** |
| ) HENRY WADE, ) | **Motion to Suppress (#24)** |
| ) Defendant. ) | |
| _____ ) | |

This matter is before the Court on Defendant Henry Wade's Motion to Suppress Evidence for Fourth Amendment Violation (#24), filed on April 23, 2013. The Government filed its Response in Opposition to Defendant's Motion to Suppress (#28) on May 29, 2013. The Court conducted an evidentiary hearing in this matter on June 11, 2013.

**FACTUAL BACKGROUND**

The indictment charges Defendant Henry Wade with being a felon in possession of a firearm in violation of 18 U.S.C. §§922(g)(1) and 924(a)(2). The charge arises out of a traffic stop and subsequent search of Defendant's automobile on March 10, 2011 during which a 9 millimeter handgun was discovered. Defendant argues that the search of his automobile violated the Fourth Amendment and that the evidence of the firearm should be suppressed.

Officer David Rose of the Las Vegas Metropolitan Police Department (LVMPD) testified at the evidentiary hearing. Officer Rose has been employed by the LVMPD for four and a half years. He testified that on March 10, 2011 at approximately 10:20 P.M. he was patrolling in the area of Seventh Street and Carson Avenue in downtown Las Vegas, Nevada. While driving westbound on Carson Avenue, Officer Rose observed an automobile traveling eastbound near Seventh Street with

no headlights on.  The automobile turned onto northbound Eighth Street at which time Officer Rose effected a traffic stop.  Shortly after Officer Rose stopped the automobile, Officer Gerald Jackson arrived to provide back-up support.

Officer Rose testified that as he approached the stopped vehicle, the driver, later identified as Defendant Wade, stuck his hands out the window of the automobile and stated "I have nothing, I have nothing."  Officer Rose found this behavior very unusual.  He testified that normally drivers will place their hands on the steering wheel or in their laps, or will start searching for their paperwork.  Officer Rose also found Mr. Wade's statement "I have nothing, I have nothing" unusual.  Normally, drivers will ask why they are being stopped or will admit that they were driving too fast or something to that effect.  Officer Rose also testified that Mr. Wade was sweating profusely.  Officer Rose testified that the temperature was normal for a March night.  It was not unusually warm.  Based on these observations, Officer Rose had Mr. Wade step out of his automobile.  Officer Rose conducted a pat down of Defendant's body as he exited the automobile and then escorted him to the front of the officer's patrol car.  Mr. Wade was not handcuffed at that time.

Officer Rose testified that Mr. Wade was in possession of a driving instruction permit.  He ran a records check on Mr. Wade which indicated his driver's license and instruction permit had been revoked.  Officer Rose prepared citations for "headlights, hours of operation" and for driving on a revoked license.  Officer Rose testified that during the stop, Mr. Wade turned around and looked at the officers and acted erratic if one of them walked behind him.  Mr. Wade also jumped and flinched and looked at his automobile when one of the officers moved toward it.  Mr. Wade also continued to sweat.  Officer Rose found this behavior very suspicious.

Officer Rose testified that Mr. Wade was detained outside his automobile for approximately 20 minutes until the process of issuing him the citations was completed.  He testified that upon issuing the citations to Mr. Wade, the officers intended to let Mr. Wade go, but he could not drive his automobile given that his license or instruction permit was revoked.  Mr. Wade apparently called his girlfriend to come and pick him up or drive the vehicle for him.  Officer Rose testified that he and Officer Smith decided that Mr. Wade should move his automobile from where

it was stopped into a nearby parking lot where he could await the arrival of a licensed driver. The officers also decided to perform a "pat down" search of the driver's seat area of the automobile before Mr. Wade moved it into the parking lot. Officer Rose acknowledged that Mr. Wade's automobile was legally parked on Eighth Street in a metered parking area.

Officer Rose testified that Officer Jackson performed a pat down search inside the automobile in the area that is within the driver's reach. Officer Jackson observed that the lid of the console between the driver's and passenger's seats was not completely closed. He saw a large mason jar in the console which was propping-up the console lid. Officer Jackson further observed what appeared to be marijuana in the mason jar. Upon Officer Smith's discovery of the suspected marijuana, Officer Rose summoned a police narcotics canine unit to the scene. The canine unit responded and the narcotics dog alerted to the presence of controlled substances in the area of the driver's seat. Officer Rose then searched the area under the driver's seat and found a handgun. Mr. Wade was placed in handcuffs after the firearm was found. Officer Rose then ran a "triple I" nationwide records check on Mr. Wade which revealed that he was a three time convicted felon out of other jurisdictions.[1] Officer Rose also contacted a firearms detective. Shortly thereafter Mr. Wade was taken into custody for being a convicted felon in possession of a firearm.

On cross-examination Officer Rose testified that Mr. Wade had pulled his car to the side of the road upon being signaled to stop by the officer and he produced a valid registration and proof of insurance for his automobile. Officer Rose also acknowledged that Mr. Wade may have put his hands outside the window so that the officers could see that he was not armed. Officer Rose further testified that upon issuing the citations to Mr. Wade, he was no longer detaining Mr. Wade and he would have been free to leave as soon as his automobile was moved into the parking lot. It is unclear from the testimony whether the officers intended to wait until Mr. Wade's girlfriend or another licensed driver arrived to take charge of the automobile. Officer Rose testified that the officers would have had the option of having Mr. Wade's automobile towed because Mr. Wade

---

[1] Officer Rose testified that he initially obtained only a local records check on Mr. Wade. He did not recall what that records check revealed about Mr. Wade's criminal record.

could not legally drive it, and it was stopped in a high crime area. Officer Rose stated that burglaries, robberies and other crimes occur frequently in the downtown area. He testified that if the automobile had been towed, the police would have conducted an inventory search of the automobile during which the firearm would also have been discovered.

Officer Gerald Jackson also testified at the evidentiary hearing. Officer Jackson has been employed by the LVMPD for approximately five years. He testified that prior to the stop, he was eating lunch in his patrol car in a parking lot directly across from where Officer Rose stopped Defendant Wade's automobile. Upon observing the stop, Officer Smith came over to provide back-up support to Officer Rose. Officer Smith recalled that Mr. Wade stuck his hands out of the window of the vehicle which he found to be unusual behavior. Officer Smith testified that he approached the passenger side of the vehicle as Officer Rose was speaking to Defendant Wade who was still inside his automobile. Officer Smith did not, at that point, hear what was said between Officer Rose and Mr. Wade.

After Mr. Wade exited his automobile, Officer Smith accompanied Officer Rose and Mr. Wade back to the front of Officer Rose's patrol car. Officer Smith stood by and observed while Officer Rose conducted the investigation. Officer Smith testified that Mr. Wade was sweating profusely. Mr. Wade also appeared to be unusually interested in the officers' movements. He was constantly turning around and appeared nervous. Officer Smith described Mr. Wade's behavior as "hyper-sensitive." Officer Smith testified that these observations, combined with the stop being in a high crime area and the time of night, caused him to suspect that something was amiss and that Mr. Wade might be armed and dangerous. Officer Smith testified that in other situations involving similar circumstances, a pat down of a suspect has resulted in the discovery of a firearm or weapon. He also acknowledged that on other occasions no weapons were discovered.

Officer Smith testified that after Mr. Wade was issued the citations he was free to leave, but was not allowed to drive his automobile. Officer Smith testified that he performed a "pat down" search in the driver's area of the vehicle to look for weapons. He confirmed that he observed a clear mason jar in the console which appeared to contain marijuana. He informed Officer Rose of what he had found, a canine unit was summoned and the narcotics dog alerted to the presence of

1  controlled substances in the vehicle. Officer Rose then searched the driver's side area and found
2  the handgun under the driver's seat.
3  Officers Rose and Smith both testified that they did not prepare written reports regarding
4  the subject incident. A written arrest report was prepared by Detective Miles which did not set
5  forth any of the observations made by Officers Rose and Smith regarding Mr. Wade's statements
6  and behavior, which they found suspicious and caused them to suspect that Mr. Wade might be
7  armed and dangerous. Both officers acknowledged, with some hesitation, that they would have
8  included the details in the report if they had written it.

## DISCUSSION

In *United States v. I.E.V.*, 705 F.3d 430, 434-5 (9th Cir. 2012), the Ninth Circuit sets forth the Fourth Amendment law governing stops and frisks:

> In *Terry v. Ohio*, the Supreme Court created a limited exception to the general requirement that officers must have probable cause before conducting a search. 392 U.S. 1, 30, 88 S.Ct. 1868, 20L.Ed.2d 889 (1968). The Court held that officers may conduct an investigatory stop consistent with the Fourth Amendment "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Id.* In addition, an officer may conduct a brief pat-down (or frisk) of an individual when the officer reasonably believes that "the persons with whom he is dealing may be armed and presently dangerous." *Id.* "[T]he stop and the frisk must be analyzed separately; the reasonableness of each must be independently determined." *United States v. Thomas,* 863 F.2d 622, 628 (9th Cir. 1988).
>
> In *Terry,* the Court also explained that the analysis regarding whether a frisk was constitutional "is a dual one," that asks (1) "whether the officer's action was justified at its inception," and (2) whether the officer's action was "confined in scope" by engaging in a "carefully limited search of the outer clothing in an attempt to discover weapons which might be used to assault" an officer. *Terry*, 392 U.S. at 20, 29–30, 88 S.Ct. 1868. The officer must provide "specific and articulable facts" that indicate something more than a general "governmental interest in investigating crime." *Id.* at 21, 23, 88 S.Ct. 1868. Indeed, a pat-down "is not justified by any need to prevent the disappearance or destruction of evidence of crime. The *sole justification* of the search in the present situation is the protection of the police officer and others nearby . . . ." *Id.* at 29, 88 S.Ct. 1868 (emphasis added) (citation omitted). Thus, the appropriate analysis is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27, 88 S.Ct. 1868.

. . .

In *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750 (2002), the Supreme Court stated that in making reasonable-suspicion determinations, the court must look at the totality of the circumstances to see whether the officer had a particularized and objective basis to stop or frisk the person. "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might elude an untrained person.'" (citations omitted). The Court further stated that although an officer's reliance on a mere "hunch" is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." (citation omitted.) *Id.,* 534 U.S. at 273-4, 122 S.Ct. at 750-1.

The lawfulness of the traffic stop is not at issue in this case. Although Officer Rose frisked Defendant Wade as he exited his automobile, the frisk did not result in the discovery of a firearm or contraband and is therefore also not challenged in Defendant's motion. Defendant, instead challenges the legality of the "pat-down" search of the interior of his automobile which resulted in the discovery of marijuana and led to the further search in which the handgun was discovered.

In *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469 (1983), the Supreme Court held that a police officer may search the interior of an automobile for a weapon where the officer has reasonable suspicion that the person detained is dangerous and could gain access to a weapon in the automobile to use against the officer. In *Long*, two police officers were on patrol at nighttime in a rural area when they observed a vehicle traveling erratically and at excessive speed. The vehicle turned down a side road and swerved off into a shallow ditch. The officers met the defendant at the rear of his vehicle. The defendant failed to respond to the officers' requests for his driver's license and vehicle registration. The defendant, who appeared to be under the influence of something, turned from the officers and began walking toward the open door of his vehicle. The officers followed the defendant and observed a large knife on the floorboard of his vehicle. The officers stopped the defendant and subjected him to a frisk which revealed no weapons. One of the officers shined his flashlight into the interior of the vehicle to see if there were any other weapons. The officer observed an open pouch of marijuana on the front seat. Defendant was arrested for

possession of marijuana.  A further search of the vehicle resulted in the discovery of additional marijuana.

In upholding the lawfulness of the officer's conduct in looking into defendant's vehicle for the presence of other weapons, the Court stated that it had previously "recognized that investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." 463 U.S. at 1047, 103 S.Ct. at 3480.  On that basis, the Court had previously held in *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330 (1977), that the police may order persons out of an automobile during a stop for a traffic violation and may frisk those persons for weapons if there is a reasonable belief that they are armed and dangerous.  *Long* noted that *Mimms* "rested in part on the 'inordinate risk confronting an officer as he approaches a person seated in an automobile.'" *Long*, 463 U.S. at 1048, 103 S.Ct. at 3480.  The Court also recognized that suspects may injure police officers and others by virtue of their access to weapons even though they may not themselves be armed.  The Court cited *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034 (1969), which held that when an arrest is made, the officers may search the area within the arrestee's immediate control, meaning "the area from within which he might gain possession of a weapon or destructible evidence." *Id.* The court also cited *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860 (1981), which held that in a search incident to arrest, the police may search the interior of a suspect's vehicle to prevent the suspect from gaining access to a weapon or to destroy evidence of the crime for which the arrest is being made.[2]

Based on these precedents, the Court held:

> Our past cases indicate then that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from

---

[2] In *Arizona v. Gant*, ---U.S. ---, 129 S.Ct. 1710 (2009), the Court held that in circumstances involving an arrest where evidence of the offense is not likely to be found in the vehicle, such as a traffic violation, the police may only search the interior of the vehicle for weapons if the arrestee has the actual ability to gain access to a weapon in the vehicle.  In so holding, the Court disapproved a long standing interpretation of *Belton* that the police may search the interior of a suspect's vehicle incident to arrest, regardless of whether he could gain access to a weapon in the vehicle.

> the possible presence of weapons in the area surrounding a suspect. These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in which a weapon might be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. *See Terry*, 392 U.S. at 21, 88 S.Ct. at 1880. "The issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others is in danger." *Id.,* at 27, 88 S.Ct. at 1883. If a suspect is "dangerous," he is no less dangerous simply because he is not arrested.

*Long*, 463 U.S. at 1048, 103 S.Ct. at 3480.

The Court also stated that if reasonable grounds exist to justify a search of the interior of the automobile for weapons, the officers are not required to adopt alternative means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter. *Id.*, 463 U.S. at 1052, 103 S.Ct. at 3482.

In this case, Officer Rose stopped Defendant Wade's vehicle for a traffic violation, traveling at nighttime without headlights. The stop occurred in the downtown area of Las Vegas which both officers described as a high crime area. Officer Rose testified that his suspicions were initially aroused when Defendant stuck his hands out of the driver's window and stated "I have nothing, I have nothing." He further testified that Defendant was sweating profusely which indicated that he was nervous. Based on these observations, Officer Rose directed Defendant to exit his automobile and as he did so, the officer conducted a physical pat down of his person which did not result in the discovery of a weapon or contraband.

It appears from the officers' testimony that Defendant Wade complied with their directions or requests during the traffic stop. After exiting his vehicle, Mr. Wade accompanied the officers to the front of the patrol car. He produced a driving instruction permit which the records check indicated was revoked. He also produced a valid registration for the vehicle which was in his name. Officer Rose's initial records check did not produce any information regarding Defendant's criminal background that Officer Rose could recall. The only behavior that the officers found suspicious after Defendant exited the vehicle, was that he continued to sweat profusely, and turned around and look at the officers when they walked behind him or flinched and looked at his

automobile if one of the officers moved toward it. This behavior caused the officers to suspect that a weapon might be located in Defendant's automobile.

Defendant Wade did not testify at the hearing and there is no evidence directly contradicting the officers' testimony about Defendant Wade's statements and behavior. Defendant, however, disputes the credibility of the officers' testimony based on the fact that the arrest report prepared by Detective Miles did not mention their observations about Defendant's statements or behavior which allegedly justified the "pat down" search of the vehicle. The absence of such documentation in the arrest report may provide grounds to discredit a police officer's testimony. *See United States v. I.E.V.*, 705 F.3d at 437 (holding that the district court properly discredited the officer's testimony that the defendant displayed nervous behavior because the written arrest report did not contain any information that the defendant acted nervous or fidgety). The Court has some doubt about the reliability of the officers' testimony given the passage of time and the fact that their observations were not contemporaneously recorded. Officers Rose and Smith, however, appeared to be credible in their demeanor and in regard to the substance of their testimony. The Court therefore accepts their testimony regarding Defendant Wade's statements and physical behavior, without necessarily accepting that the Defendant's statements and behavior provided the officers with objective reasonable suspicion to believe that he was armed and dangerous.

A reasonably cautious police officer may suspect that any automobile driver or passenger encountered during a traffic stop may be armed. The test under *Terry*, however, is whether the officer has reasonable suspicion that the individual is armed *and* poses a danger to the officer. Depending on other circumstances, the threat of danger may be heightened when the stop occurs at nighttime and in a high crime area. In *United States v. McKoy*, 428 F.3d 38, 40 (1st Cir. 2005), cited with approval in *United States v. I.E.V.*, 705 F.3d at 438, the court stated that "[w]hile officers are permitted to take the character of a neighborhood into account when assessing whether a stop is appropriate, it is only one factor that must be looked at alongside all the other circumstances when assessing the reasonableness of the officers' fear for their safety." The court also stated that nervousness is a common and entirely natural reaction to police presence. *Id.*

. . .

Defendant Wade's behavior during the detention for the traffic citations was arguably more suspicious than mere nervousness, since, in Officer Smith's words, he appeared "hyper-sensitive" to the officers' movements and displayed unusual interest or concern if the officers moved toward his automobile. Viewed in the hindsight of the discovery of marijuana and the handgun, it may be reasonable to infer that Mr. Wade's behavior was related to the presence of that evidence in his automobile. Viewed in the context of the circumstances known to the officers prior to the "pat down" search of the automobile, however, the officers' alleged suspicion that Mr. Wade was armed *and* dangerous is not persuasive. Although Mr. Wade appeared nervous and concerned, the officers' testimony also indicates that he was cooperative and compliant with their instructions. No further suspicion that Mr. Wade was engaged in criminal activity was developed during the stop, other than that Mr. Wade's driver's license or instruction permit was suspended and he could not legally drive his automobile. At some point, Mr. Wade or an officer contacted Mr. Wade's girlfriend to come to the location to pick him up or drive his car away.

It is highly unlikely that Defendant, having been issued two relatively minor traffic citations and told he was free to go once his girlfriend arrived to take charge of his vehicle, would then enter his vehicle, obtain a firearm and attempt to use it against two police officers. There was also no necessity to move Mr. Wade's automobile from the street where it was legally parked into the adjacent parking lot to await the arrival of Mr. Wade's girlfriend. The officers' decision to have Mr. Wade move the vehicle appears to have been made for the purpose of providing a reason for the officer to enter the vehicle and search the area within the driver's reach. However, even if it was reasonable or necessary to have Mr. Wade re-enter his automobile to await the arrival of his girlfriend or to move it into the parking lot, the officers did not have objectively reasonable grounds to suspect that Mr. Wade posed a danger to them to justify a *Terry* search of the interior of his automobile.

The Government asserts that the officers also had the option of impounding Mr. Wade's automobile in which case an inventory search of the vehicle would have been conducted and the marijuana and handgun would have been discovered. The officers, however, did not pursue an inventory search. Furthermore, although Mr. Wade was not allowed to drive the automobile away,

the automobile was lawfully registered to him, it was legally parked, and his girlfriend had been contacted to come to the scene to take charge of the vehicle.  There is no reason to believe that absent Officer Smith's "pat down" search of the interior of the automobile and the discovery of the marijuana, the automobile would have been impounded and an inventory search conducted.

## CONCLUSION

Based on the totality of the circumstances, the Court concludes that the officers did not have reasonable suspicion that Defendant Wade was armed and dangerous such as to justify a *Terry* search of the interior of the Defendant's automobile.  Accordingly,

## RECOMMENDATION

**IT IS RECOMMENDED** that Defendant's Motion to Suppress Evidence for Fourth Amendment Violation (#24) be **granted** and that evidence regarding the discovery of the handgun in Defendant's automobile be suppressed.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 26th day of June, 2013.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge